*Thurman, J.
The decision of this case turns upon a. single question, namely: Was the act of assembly of March 24,1851, authorizing a subscription, by Muskingum-county, to the capital
stock of the Cincinnati, Wilmington and Zanesville Railroad Company, 49 Ohio L. L. 539, abrogated by the new constitution? If it was, the plaintiff is entitled to recover; otherwise, the case is with the-defendant. That the act was valid when passed, and continued to be so until the present constitution took effect, is not denied. But. it is claimed that it was repealed by that instrument; not by any express words, however, but by necessary implication. True, s'ome of the counsel say that the question is not one of repeal. Their-argument is, that all laws now in force, derive their authority from the existing constitution; that no law can be in force whose authority is not thus derived; that, consequently, it is for the defendant, to show that the law in question is saved by the constitution, and not for the plaintiff to show that it is repealed. But this is a mere-distinction, without a difference. The constitution does expressly save all laws not inconsistent with it. None but the inconsistent, then, were abrogated. But how were they abrogated? Not by any express words of repeal, for there are none such. It follows that they fell simply because of their inconsistency. Had they been consistent, they would have continued. Being inconsistent, they ceased,. Now, it matters not whether this be cálled a repeal by implication, as we’think it should be, or a failure-to save them, as counsel would call it. Name it what you please, the rules to govern in deciding-whether a law remains in force, will be the same. No mere difference in names can make a difference in construction. But if names-are important, we doubt not that the abolition of a law, by the constitution, should be called a repeal. The State of Ohio is the same political state now that it was under the old constitution. The new constitution created no new state. It only altered, in some respects, the fundamental laws of a state already in existence; and even this was done pursuant to a prior constitution, under’ whose provisions *the convention was called, and the new *529 constitution framed. It follows, that all laws in force when the latter took effect, and which were not inconsistent with it, would have remained in force, without an express provision to that effect, and all inconsistent laws fell, simply because they were inconsistent ; in other words, all repugnant laws were repealed by implication. If the laws of a conquered country remain in force until repealed, so far as they are consistent with the government of the conquerors, a fortiori is it true that the laws of a state survive a peaceable change of its constitution, effected by its own people, and not varying the general structure of its government, to the full extent to which they are consistent with the new order of things.
But we are not without authority upon this subject, to which it is proper to refer. In the case of Ohio, on the relation of Evans, v. Dudley, 1 Ohio St. 437, the question was, whether the act creating Noble county, survived the taking effect of the new constitution. The court treated it as a question of repeal by implication, and governed by the rules that relate to such repeals. Ranney, J., delivering the judgment of the court, said: “In short, their position is, that the law creacting the county is inconsistent with the present constitution, and was repealed by it when it took effect. Tf such inconsistency is found to exist, after a fair and honest effort to reconcile them, it can not be doubtful which ’must give way, and the conclusion contended for by the relator would inevitably follow. The rule by which we should be guided in pursuing this inquiry is well settled. As repeals by implication are not favored, the repugnancy between the provisions of two statutes must be clear, and so contrary to each other that they can not be reconciled, in order to make the latter operate a repeal of the former. This rule is the result of a long course of decisions, and we know of no reason why it does not equally apply, when the repugnancy is alleged to exist, between a constitutional provision and a legislative enactment. With this principle in view, we proceed to the inquiry: Does such necessary and obvious repugnancy exist between the law creating this county and the constitution ? ”
*That the rule was not too strongly stated by the judge, is apparent from a multitude of cases; and from none more clearly than those of our own state. Thus, in Ludlow’s Heirs v. Johnston, 3 Ohio, 553, we find it said: “ When the provisions of two statutes are so far inconsistent with each other that both can not be enforced, the latter must prevail; but if, by any fair course of reasoning, *530 Me two can be reconciled, both shall stand. When the legislature in'tend to repeal a statute, we may, as a general rule, expect them to do it in express-terms, or by the use of words which are equivalent to an express repeal. No court will, if it can consistently be avoided, determine that a statute is repealed by implication.”
So, in the case of Dodge v. Gridley, 10 Ohio, 178, it was held, that ** when two affirmative statutes exist, one is not to be construed to repeal the other by implication, unless they can be reconciled by no mode of interpretation.”
In the light of this rule, then, let us examine the provisions of the constitution that are said to be repugnant to the continued existence of the law in question.
The first provision to which I shall refer, and upon which the plaintiff seems chiefly to rely, is section 6 of article 8, and is in these words: “ The general assembly shall never authorize any county, town, or township, by vote of its citizens or otherwise, to become a stockholder in any joint-stock company, corporation, or association whatsoever; or to raise money for, or loan its credit to or in aid of, any such company, corporation, or association.”
Is there any “necessary and obvious” inconsistency between this section and the law before named, enacted under the old constitution? Are they “so contrary to each other that they cannot be reconciled? Is there no “fair course of reasoning,” “no mode of interpretation,” by which this canbe done? These are the questions to be asked, according to the authorities, and upon the answer that may be given depends the decision of the point.
Now, I-apprehend that instead of there being any such necessary and obvious repugnancy, it requires no little ingenuity *to show any repugnancy at all. So far from there being no fair course of reasoning4 by which the section and the law may be reconciled, all that is required to reconcile them is, to let the section speak according to its terms. Instead of there being no mode of interpretation upon which the law can stand, the most natural and obvious construction in nowise interferes with it. The section plainly refers to future legislation, and to future legislation only. The general assembly it speaks of, is the assembly created by the ■constitution, and not any past assembly. The acts it prohibits, are not subscriptions under existing laws, but the making of any more such laws.
It is said, however, that notwithstanding such are the terms of *531 the section, its spirit is more comprehensive. But when was a statute repealed by the spirit of another, with whose terms it was perfectly consistent? When was an enlarged meaning given to a statute, beyond the import of its words, in order to repeal another statute by implication? We have met with no such case, and none has been pointed out to us. Furthermore, it is not upon the terms alone of the section, that the argument against repeal is founded. It derives great force from a comparison with other provisions, as I shall hereafter have occasion to show. Neither does the spirit of the constitution require what the plaintiff contends for, unless, indeed, we have greatly mistaken the purpose of its framers. That the convention regarded subscriptions of the character in question as impolitic, is certainly true. That the people concurred in this opinion is equally manifest. That it was designed to prevent, in future, the enactment of any law to authorize them, is perfectly clear. But that it was intended to repeal existing laws—that it was meant to prohibit subscriptions already authorized—neither the language nor the history of the constitution warrants us in saying. On the contrary, both the one and the other, as I shall hereafter attempt to prove, repel the idea.
We are referred to section 3 of article 8, forbidding the state to incur debts, with certain exceptions; and to section *6 of article 12, by which she is prohibited from contracting any debt for purposes of internal improvement;, and it is argued that the state being thus disabled, her several parts are equally impotent; that a prohibition upon the state at large, necessarily includes a prohibition upon her subdivisions.
But an examination of the constitution will show that this argument proves too much, and is obviously inconsistent with the provisions and intent of the instrument. First, let us look at sections 1; 2, and 3, of article 8, which are as follows:
“ Sec. 1. The state may contract debts to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by one or more acts of the general assembly or at different periods of time, shall never exceed seven' hundred and fifty thousand dollars; and the money arising from the creation of such debts shall be applied to the purposes for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever.
*532 “ Sec. 2. In addition to the above limited power, the state may contract debts to repel invasion, suppress insurrection, defend the-state in war, or to redeem the present outstanding indebtedness of the state; but the money arising from the contracting of such debts shall bo applied to the purpose for which it was raised, or to repay such debts, and to no other purpose whatever; and all debts incurred to redeem the present' outstanding indebtedness of the state shall be so contracted as to be payable by the sinking fund hereinafter provided for, as the same shall accumulate.
“Sec. 3! Except the debts above specified, in sections one and two of this article, no debt whatever shall hereafter be created by or on behalf of the state.”
Now, if the limitations imposed by these articles upon the state, are e.x necessitate limitations upon her political subdivisions also, then it follows that the aggregate indebtedness of both state and subdivisions can never exceed $750,000, aside from debts contracted to repel invasion, suppress ^insurrection, defend the state in war, and redeem her present indebtedness. The consequence would be, that if the state herself should become indebted to that amount, none of her subdivisions, while such indebtedess continued, could contract any debt whatsoever, unless it was to repel invasion, suppress insurrection, or defend the state in war. And the converse would be also true, that the state would be equally powerless, if the subdivisions became first indebted to that amount. It is hardly necessary to add that such an absurdity could never have been intended, and that, to say nothing of the mischief it would occasion to counties, cities, and towns, it would practically render null Empower conferred upon the state by the first of these sections.
Section 6 of article 12 is in these words : “ The state shall never contract any debt for purposes of internal improvement.” Does this relate to the subdivisions of the state? If so, they may prove quite inefficient to accomplish a chief end of their creation. A flood washes away a county road and endangers a county bridge. Upon the above construction, the one must remain unrepaired, and-the other unprotected, if there are no funds in the county treasury. Nothing can be done until taxes are laid and collected, though, in the meantime, the injury may increase a hundred-fold, and all travel be interrupted. The streets, or wharves, or water-works of a city may need instant repair; but none can be made unless there, are taxes in the public purse. Is such the design of the constitu *533 tion? We do not think so. The natural and obvious meaning of these several sections, applies their limitations to the state alone, and not to her subdivisions. And that the state only was intended, is further shown by the fact, that the constitution constantly keeps in view the distinction between her and her parts. The idea, now contended for, that each limitation upon her power is necessarily a limitation upon the power of her subdivisions, does not seem to have entered the mind of the convention. That they did not act upon this idea is very manifest. Hence we find in the constitution, section 6 of article 8, before quoted, notwithstanding it had been previously ^declared by section 4 of the same article that, “ The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation whatever; nor shall the state ever hereafter become a joint owner •or stockholder in any company or association, in this state, or elsewhere, formed for any purpose whatever.” So, too, it is declared (article 10, section 5), that “no money shall be drawn from any county or township treasury, except by authority of law,” although, in a previous pai’t of the constitution (article 2, section 22), a similar provision is found in respect to the treasury of the state.
Again, keeping in view the difference between state debts and expenses, and the debts and expenses of her subdivisions, it is provided (article 12, section 4) that, “ The general assembly shall provide for raising revenue, siifficient to defray the expenses of the state, for each year, and also a sufficient sum to pay the interest on the state debt;” while, by section 5 of article 8, it is declared that, “ The state shall never assume the debts of any county, city, town, or township, or any corporation whatever, unless such debt shall have been created to repel invasion, suppress insurrection, or defend the state in war;” and, by section *1 of.article 10, it is provided that, “ The commissioners of counties, the trustees of townshijDS, and similar boards shall have such power of local taxation, for police purposes, as may be prescribed by law.”
But this is not all. So far was the convention from supposing, that the provisions, relied on by the plaintiff, would operate as limitations upon the political subdivisions of the state, that we find an express provision for restricting, by law, the powers of cities and villages, in respect to taxes, debts, and loans. By article 13, section 6, it is ordained that, “ The general assembly shall provide for the organization of cities and incorporated villages by general laws ¡ *534 and restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent the abuse of such j>ower.” In short, the idea that limitations of the power of the state, as such, operate as ^limitations upon the power of each of her subdivisions, is not the theory upon which the constitution was written. It was not supposed by its framers, that the mathematical axiom that, “ the greater includes the less,” would be an invariable canon of construction, in considering their work. Had such been their thought, there is more than one provision that would have been omitted, as both useless and calculated to mislead. Especially, for those reasons, would section 6 of article 8 have been omitted. But they would have done something more than omit. They would háve inserted provisions to guard against the mischiefs that would result from, such a rule of construction.
I do not mean to say that there is no case in which this rule should apply. But I do mean to say that, in general at least, when the constitution speaks of the “ state,” the whole state, in her political capacity, and not her subdivisions, is intended. That such is the natural import of the language used, no one denies. ' That such must be its construction, to make the constitution consistent with itself, and sensible, is very apparent.
Nor do I mean to assert that any subdivision of the state is, in any sense, sovereign. The construction for which I contend, leads to no such absurdity. That the powers of the subdivisions, as well as of the state herself, are derived from the constitution, is undoubtedly true. But equally true is it that it was competent for the people to confer upon the one, powers not conferred upon the other; and there' is nothing in the least degree irrational, in supposing a grant of power to a subdivision, that is withheld from the state at large.
We are also referred to section 26 of article 2, which provides, that, “All laws of a general nature shall have a uniform operation throughout the state; nor shall any act, except such as relates to public schools, be passed, to take effect upon the approval of any other authority than the general assembly, except as otherwise provided in this constitution.”
That the first branch of this section has had the effect to *abolish certain laws of a general nature, whose operation was confined to particular localities, I have not the least doubt; but the act under consideration -is not a law of that character.
That it is a public law, of which the courts ex officio take notice, *535 may well be admitted; but it does not follow that it is of a general nature. It is no more of a general nature than would be an act to authorize the construction of a bridge or the erection of a poorhouse. As well might it be said that the act authorizing Hamilton county to build a jail (49 Ohio L. L. 130), was of a general nature, and therefore repealed. All such acts are, of necessity, local in their character. The origin of this section is perfectly well known. The legislature had often made it a crime to do in one county, or even township, what it was perfectly lawful to do elsewhere; and had provided that acts, even for the punishment of offenses, should bo in force or not in certain localities, as the electors thereof respectively might decide. It was to remedy this evil and prevent its recurrence that this section was framed. How far it reaches, it is not now necessary to decide. That it may sometimes be difficult to say whether an act is within its meaning or not, is very probable. But, certainly, it can not be doubted that whore, in the nature of things, the character of an act is necessarily local, the first branch of the section has no application.
Neither does the remaining branch apply to the case before us. For even wore a retroactive operation given to it, which we do not mean to say can be done, it does not touch the law in question, which took effect as soon as passed, and derived none of its validity from a vote' of the people. 1 Ohio St. 88, 89.
Finally, we are reminded that the subscription by the commissioners of Muskingum county was an act of government, and that no governmental act can be of any validity unless authorized by the constitution; for all powers not delegated by that instrument “ remain with the people.” Art. 1, sec. 20.
*The truth of these propositions will not be denied; for nó one protends that the subscription was an individual act, or that there are two constitutions in force in the state. On the other hand, it can not be assorted that to the existence of a power an express delegation is necessary; that a power may bo either expressly granted, or granted by implication, every one will admit. And it will also be admitted that, while we should be careful not to extend the powers of government by far-fetched implications, we should be equally careful not to defeat the purpose of the constitution by a narrow and unreasonable construction.
Now, we have seen that all laws not inconsistent with the constitution are expressly saved by it; and if it be admitted that this *536 provision was adopted with a knowledge that the rules respecting repeals by implication would apply, there is much reason for saying that it ends this controversy. Eor it may be argued that the law in question not being necessarily and obviously repugnant to any specific provision of the constitution, is expressly saved by it ; and that, therefore, the power to make a subscription, under this law, is not one of the reserved rights of the people. But it may be objected that this leaves out of view the provision itself by which rights are reserved; and it may be, and is, said that the true rule is, that no act can be done under authority of previous laws, which could not be authorized by the existing assembly; or, in other words, that all laws that could not now be passed are inconsistent with the constitution.
If this were admitted as a rule, it would nevertheless be found fairly inferable from the constitution that the case under consideration is an exception. But the constitution does not seem to have been framed upon this rule. Its almost universal language of prohibition is prohibitory of acts and not of legislation. Of course, I speak of the terms of the prohibitions and not of their effect. To forbid an act is obviously to forbid the making of a law to authorize it; but the converse is not necessarily true, or, in all cases, probable; for it by no means follows, from a prohibition of ^future legislation, that it was designed to prohibit acts authorized by existing laws.
There might be very good reasons for prohibiting the one and suffering the other; good reasons for saying that so far as such acts are authorized, we will let them be performed, but none shall be performed under the sanction of future laws—the laws already in existence we will not touch, but no more such laws shall ever be passed. Now, these, we think, were precisely the views of the convention. Subscriptions of the character in question were regarded as an evil; but to prohibit those already authorized, would be productive of mischief. It was necessary to choose between two evils, and’ to let past legislation alone was deemed the lesser. Under that legislation, large subscriptions had been made to works not yet completed. The subscribers were not individuals only, but also counties and townships, cities, towns, and villages. They subscribed under the belief that the laws would continue in force, and that other municipalities would also subscribe. Upon the making of such further subscriptions, depended probably the completion *537 of the. works, and the remuneration of the stockholders. To cut off such subscriptions, would be to stop the enterprises, and sink •the sums expended. That this would not always happen, might be very true; but that it would happen often enough to be a serious evil, was certainly believed. Besides, by means of such subscriptions, certain roads had been made, and portions of the state had been largely benefited. To take from other portions the like means, after they had been authorized, would seem somewhat like oppression. And it would also look like favoring the finished roads, by crippling those that were incomplete. Nor is it unworthy of remark, that the adoption of the constitution was by no means certain. That fears were entertained by its friends, is matter of •history. That these fears were felt in the convention, its debates will show. That they had an influence in preventing a prohibition of all subscriptions, there is good reason to believe. It was probably not deemed advisable to incur the hostility of those interested *in unfinished roads, by an abolition of the laws passed foj.' their benefit. It was possibly thought better, even by some who preferred a sweeping prohibition, to lot existing laws alone, rather than, by seeking too much, to lose all.
It is argued, however, that the convention intended to prohibit all subscriptions, because they must have foreseen that, otherwise, the legislature, then in session, could practically nullify the constitutional provisions by authorizing every county and other municipality to subscribe.
To this argument, two answers may be given, either of which is sufficient. 1. That it was not presumable that the legislature would do any such thing; and, 2. That if it was so disposed, the constitution, even upon the plaintiff’s own construction, could not have prevented it. For it did not take effect until September 1, 1851, over five months after the adjournment of the convention; in which intermediate time every county and town in the state, on the line of a projected railroad, might have boon required to subscribe, had the legislature seen fit to order it.
But no such order was made. With the draft of the constitution before them, and with every facility for ascertaining the views of the convention, the legislature gave the same construction to its provisions that we give to them; and although they authorized subscriptions to bo made, they refrained from requiring them; and although they made the votes of the people conditions precedent, *538 they did not appoint the elections before the constitution would take effect.
But we are not left to speculate as to the design of the conven tion. We have much firmer ground to tread upon than legislative interpretation, or the unwritten history of the constitution.
When section 6 of article 8 was under discussion in. the convention, it was distinctly declared, in substance, by. a leading member of the committee that reported it, that it did “not cut off,” but “protected” subscriptions that might be authorized before the constitution would take effect; and this assertion was denied by no one, although many members *took part in the debate. Strong hostility was manifested by several speakers to the policy of all such subscriptions, and all amendments calculated to favor them, more than they were favored by the section as reported, were promptly voted down. The attendance of members was very full, and the opponents of subscription wore a large majority. The subject excited much interest, and the debates upon it were spirited and able. Under such circumstances, if the construction announced by one of the framers of the section was not the true one, it is reasonable to suppose it would have been denied. That it was not denied, I have already stated; I might also have said that its correctness was not even questioned.
Now, although the debates of the convention can never overthrow a plain, unambiguous provision of the constitution, as I have once before had occasion to say at this term, yet they certainly may fortify us in following the natural import of its language, and legitimately aid in removing our doubts.
It is, however, upon the constitution itself that I prefer to rely. I have before said that its almost universal language of prohibition is prohibitory of acts and not of legislation. I have no space, in this already too extended opinion, to refer to these various provisions, nor is it essential that I should. They are familiar to all who have studied the instrument, and will be discovered by any one who will read it. But in section 6 of article 8, the language is changed. Instead of directly prohibiting the act of subscription, as is done but two sections before in the case of the state, it is merely provided that, “The general assembly shall never authorize,” etc. Now, why this change of phraseology, this mere restraint of future legislation, this omission to forbid, in terms, the subscription itself, no matter when authorized, unless existing laws, as declared in the *539 debate before alluded to, were to be “ protected ” instead of being “cut off?” Upon what other hypothesis can this departure from the usual course be accounted for ? Can it be believed that, with the ^subject immediately before them, with a section framed to meet it under consideration, and with the strongest disposition to suppress the evil, so far as policy required, the convention, through mere carelessness, failed to expressly prohibit what they intended to forbid; nay, more, by a change of phraseology, as-striking as it is singular, opened a wide door for saying no such prohibition was designed ? Can it bo believed that a prohibition so important was left to mere inference, when fewer words would have-made it explicit, and that, too, after it had been openly assorted that the true inference was it did not exist ?
Again : The’constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers. It recognizes-them as things already in being, with powers that will continue to exist, so far as they are consistent with the organic law, until modified or repealed. Thus there is no express provision that a county may make a road or contract a debt, yet no one will doubt for a moment that it may do both. Indeed, its power to contract debt is recognized, beyond even the authority conferred by law. It -is clearly assumed in section 5 of article 8, that it may create debts to repel invasion, suppress insurrection, or defend the state in war, although no such power has ever been conferred by statute, so far as I can discover. If it can- thus incur debts, it may, of course, levy taxes to pay them; notwithstanding its only express grant of the taxing power is, by section 7 of article 10, for “police purposes.” The same thing may be said of townships, cities, towns,, and villages.
I mention these matters to show the idea upon which the constitution was framed, and some of its implications. But there is-another provision that bears more directly upon the question at. issue. A loan of credit, by the state or one of her subdivisions, was considered an evil of equal magnitude, perhaps, with that of taking stock. Hence, the state is forbidden to make any such loan to any individual association or corporation whatever (section 4, article 8) ; and if the plaintiff’s construction is right, her municipalities are in like manner ^disabled. But by section 6 of article 13, it is ordained that, “ The general assembly shall provide for the organization of cities and incorporated villages by general- *540 laws, and restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent the abuse of such power.”
Now, why this provision; why this recognition of a power to make a loan of credit, if all such loans are absolutely forbidden? Will it be said that all are not forbidden; that it is only loans to as•sociations or corporations that are prohibited ? Is this the fact ? Is it true that credit may be loaned to a single individual to make a road, but may not to a company ? Is this the construction that the constitution must receive? If it is, it is easy to see that its prohibitions are worthless, or little better than worthless. But it is not by this distinction that the section can be accounted for. We must look for some other reason to explain its existence; and what better reason can be found than that which 'results from the views I have expressed? When-the constitution was adopted, laws were in existence authorizing such loans of credit, and it was not intended to •disturb them. I mean that it was not intended to repeal them by the constitution itself; but, on the contrary, they were left for the action of the assembly. Hence the power to make such laws was properly recognized, and there is no inconsistency betwéen the rec•ognition and the prohibition of the enactment of any more such laws. Btit the same policy that was applicable to cities and villages, was equally applicable to townships and counties; the same policy that required loan laws to be saved, equally required that subscription laws should be left untouched. The legislature could repeal both, provided vested rights wore not destroyed, and in the hands of that body, the subject might be loft. No more such laws could ever be enacted ; and the existing evil would not greatly be increased, by suffering past laws to remain in force.
And hero I may remark, that nothing could be more erroneous than the estimate made by counsel, of the debt that *may yet be incurred, if our views are correct. I have said “ estimate,” though guess would be a more proper word; for it is confessedly made without examination. The amount supposed is $100,000,000 ; which would be an average of over eleven hundred thousand dollars for each county l I doubt exceedingly whether all the subscriptions in the whole state, made, or that will be made, since the constitution took effect, will reach the sum here supposed for a single county. I think, after a somewhat careful examination, that it may be safely affirmed, that such subscriptions can never reach two millions. I *541 believe one million is much nearer the mark. And this is upon the-hypothesis that the laws will remain unchanged. But it is not to-be forgotten that the legislature has a power of repeal, that maybe exercised to prevent further subscriptions; and that ought to be exorcised to the full extent demanded by the public welfare.
In regard to section 19 of article 1, all that need be said is, that it has no reference to the taxing power. 1 Ohio St. 77.
Upon the whole, a majority of the court are of opinion, that the law in question is not inconsistent with the constitution, and is-therefore in force. With all our prepossessions against the policy of these stibscriptions, we are unable to arrive at the opposite conclusion. We can not treat the constitution as a series of mathematical axioms, from which none but infallible deductions are admissible. Nor can we yield our assent to every deduction that may be logically drawn from any one of its generalities. We regard it as a law, subject to the imperfections of legislation; in the construction of which, as of all other laws, the intent of the lawgiver must, if possible, prevail. We have long and faithfully sought to discover that intent, and with great respect for those who differ with us, we believe we have succeeded.

Judgment for defendant.